UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| CHARLIE DUNCAN, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | Case No. 3:17-cv-00025 |
| | : | |
| v. | : | Judge Thomas M. Rose |
| | : | |
| MINNESOTA LIFE INSURANCE COMPANY, | : | |
| | : | |
| Defendant. | : | |

---

**ENTRY AND ORDER GRANTING DEFENDANT'S MOTION TO UPHOLD THE ADMINISTRATIVE DECISION (DOC. 57), DENYING PLAINTIFF'S MOTION TO VACATE ERISA BENEFIT DENIAL AND PROCEDURAL CHALLENGES TO THE ADMINISTRATIVE DECISION OR ALTERNATIVELY FOR REMAND (DOC. 59), DISMISSING PLAINTIFFS' FIRST AMENDED COMPLAINT (DOC. 11) WITH PREJUDICE, AND TERMINATING THIS CASE**

---

Pending before the Court are two competing motions. One is Defendant's Motion to Uphold the Administrative Decision (Doc. 57), filed by Defendant Minnesota Life Insurance Company ("Minnesota Life"). The other pending motion is Plaintiffs' Motion to Vacate ERISA Benefit Denial and Procedural Challenges to the Administrative Decision or Alternatively for Remand (Doc. 59).[1] Minnesota Life and Plaintiffs each filed a response to the other's pending motion. (Docs. 60, 61.) In accordance with the Court's August 7, 2019 Order establishing a briefing schedule for cross-motions for judgment on the administrative record (as amended by granting a subsequent unopposed motion for extension of time) (Docs. 52, 56), the two pending

---

[1] The Plaintiffs in this action are Charlie Duncan, as Executor of the Estate of Paul W. McVay ("Duncan") and Janet Freel, as Beneficiary of the Estate of Paul W. McVay ("Freel"). Duncan and Freel collectively will be referred to as "Plaintiffs."

1

motions are fully briefed and ripe for review. (Docs. 57, 59, 60, 61.)

For the reasons discussed below, the Court **GRANTS** Defendant's Motion to Uphold the Administrative Decision (Doc. 57) and **DENIES** Plaintiffs' Motion to Vacate ERISA Benefit Denial and Procedural Challenges to the Administrative Decision or Alternatively for Remand (Doc. 59). The Court dismisses Plaintiffs' Amended Complaint (Doc. 11), with prejudice, and terminates this case.

I. **FACTUAL BACKGROUND**

This is a case brought pursuant to, and governed by, the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 - 1461.[2] The dispute involves Minnesota Life's denial of a claim for accidental death and dismemberment insurance benefits.

(1) **Policy, McVay's Health, and McVay's Death**

Paul W. McVay ("McVay" or "Decedent") was an insured under a policy issued by Minnesota Life (Group Policy Number 33073-G) (the "Policy"). Under the Policy, McVay had insurance coverage for $320,000 in basic life insurance benefits and an additional $320,000 pursuant to an Accidental Death and Dismemberment (AD&D) Rider. Significantly, the Policy's AD&D Rider states, in part:

> This rider provides a benefit for a certificate holder's accidental death or dismemberment which occurs as a result of an accidental injury. …
>
> Accidental death or dismemberment by accidental injury as used in this rider means that the certificate holder's death or dismemberment results, directly and independently of all other causes, from an accidental injury which is unintended, unexpected, and unforeseen. …
>
> In no event will we pay the accidental death or dismemberment benefit where the certificate holder's death or dismemberment results from or is caused directly or

---

[2] The policy at issue was part of an employee welfare benefit plan.

2

indirectly by any of the following: …

    (3) Bodily or mental infirmity, illness or disease; …

We will pay the accidental death and dismemberment benefit upon due proof that the certificate holder died or suffered dismemberment as a result of an accidental injury.

(Doc. 54-1 at PAGEID # 1096; *see also* Doc. 54-5 at PAGEID # 1415 (same).)

At the time of his death on November 13, 2010, McVay was 65 years old and suffering from Acute Lymphocytic Leukemia ("leukemia") and general debility for which he had left work and been hospitalized since approximately January 15, 2010. On September 24, 2010, McVay was admitted to Hillspring Health Care Center ("Hillspring") from an acute care hospital. The recorded reason for his admission was leukemia, weakness, hemodynamic instability, and bacteremia. At the time of admission, McVay needed assistance with, among other things, dressing, grooming, bathing, bed mobility, transfer, ambulatory, and eating. His gait was unsteady, he had non-weight bearing status, and he used a wheelchair for locomotion.

Hillspring records indicate that, approximately a month before his death, McVay had "potential for falls" due to, among other things, weakness and poor balance. Approaches for addressing that problem included the assistance of two persons to transfer him, siderails in his bed, and use of a wheelchair. A stated goal was that McVay "WILL NOT SUSTAIN ACUTE PHYSICAL TRAUMA OF A SERIOUS NATURE DUE TO FALLS." (Doc. 54-2 at PAGEID # 1227.)

On October 24, 2010, less than three weeks before his death, McVay's blood test revealed a very low platelet count. Treatment notes from the next day indicate that McVay was working to improve his mobility, but he "worries about falling" and had "significant weakness in quads." (Doc. 54-2 at PAGEID # 1282.) Treatment notes from the following week indicate that McVay

"[c]ontinues to be most limited by [lower extremity] strength and fatigue as well as anxiety." (*Id.*)

The week before he died, McVay was taken to the emergency department of Sycamore Hospital. Sycamore Hospital records indicate that McVay was admitted on November 8, 2010 with a contusion and head pain after having "fallen 5 times recently." (Doc. 54-4 at PAGEID # 1367-68.) He presented to the emergency department "with left-sided head pain" and said that "he's had multiple falls." (*Id.*) The Sycamore Hospital records also indicate McVay came from Hillspring "with frequent falls," that "falls are normal" for McVay, he was a "Fall Risk," and his final diagnosis was "acute lymphocytic leukemia with low platelets." (*Id.* at PAGEID # 1368, 1373, 1375.) It appears that Sycamore Hospital transferred McVay back to Hillspring that same day (November 8, 2010).

Hillspring records from five days before his death (November 8, 2010) indicate that McVay "has suffered an overall decline in functioning this week," had a "general decline in endurance," and had been "sent out to hospital" due to "week long increased confusion and 5 plus times falling OOB [out of bed]." (Doc. 54-2 at PAGEID # 1276, 1282.) According to Hillspring records,[3] on the day of his death, McVay was in a wheelchair in a well-lit, clear hallway wearing non-skid footwear. A staff member turned to go into another resident's room, looked back at McVay, and observed McVay stand up from the wheelchair and fall to the floor. McVay died later that day. The Supplementary Medical Certification for McVay's death certificate, signed by Russell L. Uptegrove, M.D., lists:

---

[3] In its response brief in opposition to Plaintiffs' motion, Minnesota Life asks the Court to strike certain records (Doc. 59-6) attached to Plaintiffs' motion. (Doc. 60 at PAGEID # 2205.) The Court denies the request. *See Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 171 (6th Cir. 2007) (court may consider evidence outside the administrative record if that evidence is offered in support of a procedural challenge to the administrator's decision). As shown throughout Plaintiffs' Motion—including within its title—Plaintiffs raise procedural challenges to Minnesota Life's decision-making. (Doc. 59.)

- "Accident" as the manner of death;

- "Deceased Fell" as the description of how the injury occurred;

- "TRAUMATIC SUBDURAL HEMATOMA" as the "Immediate Cause" of death[4]; and

- "Leukemia (subtype unknown)" as "Other Significant Conditions contributing to death but not resulting in the underlying cause."

(Doc. 54-3 at PAGEID # 1305.) Similarly, the Postmortem Examination (autopsy) report from Bryan D. Casto, M.D., Forensic Pathologist Deputy Coroner for Montgomery County, states: "It is my opinion that the cause of death of Paul McVay is: Traumatic subdural hematoma. The death is contributed to by leukemia (subtype unknown)." (Doc. 54-3 at PAGEID # 1312.) That report also references a reported clinical history of leukemia. (*Id.*)

### (2) Procedural History

Following McVay's death, a claim was made under the Policy for $320,000 in basic life benefits and for $320,000 in AD&D benefits. Freel submitted information to Minnesota Life, and Minnesota Life requested complete medical records from Hillspring, as well as copies of police/accident reports, ambulance reports, autopsy reports, the death certificate, toxicology reports, and medical records for any hospitalization(s) related to the incident. According to Minnesota Life, at this point, it had no knowledge of, and did not receive any medical records from, McVay's visit to Sycamore Hospital (discussed above).

Minnesota Life paid Freel $320,000 in basic life benefits. However, Minnesota Life denied the claim for AD&D benefits. In a letter sent to Freel on April 15, 2011, following a review of the file by one of Minnesota Life's physician consultants, Minnesota Life stated:

---

[4] A subdural hematoma is a collection of blood on the brain's surface. *Wade v. Minn. Life Ins. Co.*, 29 F. Supp. 3d 891, 893 n.1 (S.D. Tex. 2014).

> Dear Ms. Freel:
>
> As you know, we have been reviewing this claim for possible accidental death benefits on behalf of your brother, Paul W. McVay. Our investigation and review have now been completed. We must deny liability for these benefits. Please allow me to explain:
>
> The applicable policy provision states:
>
> *What does accidental death or dismemberment by accidental injury mean?*
>
> *Accidental death or dismemberment by accidental injury as used in this rider means that the certificate holder's death or dismemberment results, indirectly and independently of all other causes, from an accidental injury which is unintended, unexpected and unforeseen.*
>
> *In no event will we pay the accidental death or dismemberment benefit where the certificate holder's death or dismemberment results from or is caused directly or indirectly by any of the following:*
>
> *(3) bodily or mental infirmity, illness or disease;*
>
> Based upon the evidence received, Mr. McVay's death was not the sole result of an accidental injury, independent of all other causes, as defined in the policy. The records we received indicate that Mr. McVay had leukemia resulting in low platelet counts. He was receiving physical therapy for significant bilateral lower extremity weakness and was therefore listed at high risk for falls due to his weakness. The records also indicate that he had critically low platelet counts. Low platelet counts have been known to cause spontaneous bleeding. Leukemia is also noted as contributing to Mr. McVay's death.
>
> Based on the information available to us, Mr. McVay's death is not covered under the terms of this policy.
>
> If you should have any questions or evidence to the contrary, please do not hesitate to contact our office at the toll free number listed above.

(Doc. 54-2 at PAGEID # 1204 (italics in original).) Minnesota Life also provided Freel with a notice of her right to appeal the adverse benefit determination concerning the AD&D benefits. That notice stated that she "may submit any written comments, documents, records and other information relating to this claim. Our review will take into account all additional information submitted by you and related to your claim without regard to whether such information was

6

submitted or considered in our initial decision." (Doc. 54-2 at PAGEID # 1206.)

On June 10, 2011, counsel for Plaintiffs sent a letter to Minnesota Life exercising a right to appeal the denial of benefits under 29 U.S.C. § 1133(2). In support of the appeal, the letter cited to and attached the death certificate and supplemental medical certificate, as well as a single-page letter dated May 13, 2011 from McVay's treating physician, Dr. Richard Chamberlain (the "Chamberlain Letter"). The Chamberlain Letter states:

> Mr. McVay died on 11/13/2010 due to an intracranial hemorrhage after a fall. He had multiple falls in the nursing home but his fall on November 13th was significant enough that [it] caused immediate bruising and change in mental statuses which subsequently lead [sic] to further decline and he died shortly thereafter.
>
> It is my medical opinion that Mr. McVay's death was directly and solely related to an intracranial bleed secondary to trauma from a fall. Mr. McVay has suffered from cancer and has received cancer treatments for years that have resulted in chronic thrombocytopenia. This thrombocytopenia was asymptomatic and caused him no problem except for bruising. The thrombocytopenia did not cause his death and Mr. McVay would not have died if he had not have [sic] fallen that day. …

(Doc. 54-2 at PAGEID # 1190.)

As part of the appeals process, Minnesota Life internally requested another review of the entire file and a review of the additional information provided by Dr. Chamberlain. Minnesota Life also informed Plaintiffs' counsel that, in order for Minnesota Life to continue its review of the appeal, it requested assistance in obtaining complete copies of McVay's medical records regarding a hospitalization that began on November 8, 2010.[5] (*See, e.g.,* Doc. 54-1 at PAGEID #1080 (notes concerning 7/13/11 call to Plaintiffs' counsel), #1185 (9/16/11 letter to Plaintiffs' counsel).)

On November 27, 2012, Minnesota Life sent a letter to counsel for Plaintiffs. That letter

---

[5] This would be McVay's admission to Sycamore Hospital that is discussed above, but (according to Minnesota Life) Minnesota Life did not know the name of the hospital at the time.

states, in part:

> Although the death was ruled accidental, this policy does have an exclusion for this type of event. Based on the records we previously received, due to the advanced stage of Mr. McVay's disease, he became very weak which resulted in numerous falls. Therefore, his fall was not independent of all other causes, and his leukemia did contribute to his demise as noted on the death certificate. Based on the information we have received thus far, our position remains unchanged.
>
> Your appeal letter dated June 10, 2011 was received, and as part of our normal appeal process, our Medical department again reviewed the entire claim file. During this review, it was noted in the Hillspring nursing home records that Mr. McVay was discharged to a hospital on November 8, 2010. The records do not identify to which hospital he was sent. As part of this appeal, we would like to evaluate any and all information related to Mr. McVay's treatment to determine whether or not it changes our initial determination.
>
> As we do not have knowledge of the name of the hospital where he was sent, we requested your assistance in obtaining these records in a letter dated September 16, 2011. We have not yet received a response from you with regard to that request. If you can provide us with the name of the hospital, we would be glad to request that information.
>
> Upon receipt of this additional information, we can continue our handling of this claim. If you should have any questions regarding this matter, please do not hesitate to contact our office at the toll free number listed above.

(Doc. 54-1 at PAGEID # 1118.)

Minnesota Life followed up with a host of additional communications to Plaintiffs' counsel requesting information concerning McVay's November 8, 2010 hospitalization. (*See, e.g.,* Doc. 54-1 at PAGEID # 1116 (12/18/12 letter), 1108 (2/21/13 letter); Doc. 54-3 at PAGEID # 1354-55 (again requesting assistance in obtaining records from unnamed hospital and stating that "[w]ithout those records to further evaluate this claim, our position still remains unchanged, as indicated in our letter to you of November 27, 2012").) Although, according to Plaintiffs, Minnesota Life had full authority to access McVay's medical records via an authorization for release of health-related information (*see* Doc. 54-2 at PAGEID # 1301-02), logically Minnesota Life could not request the

8

hospital records for that hospitalization without knowing the name of the hospital from which to request the records.

Eventually, by letter dated June 3, 2016, Plaintiffs re-opened McVay's succession solely to procure the requested records and then produced medical records of McVay's November 8, 2010 visit to Sycamore Hospital. (Doc. 54-4 at PAGEID # 1366.) In that letter, counsel for Plaintiffs also said: "[I]f this is indeed what you were looking for, please set a submission date for the appeal and let me know so that I can submit any further materials that I may care to file. I trust that this will satisfy your records request, but please let my office know if there are any further documents needed." (*Id.*; *see also* Doc. 54-4 at PAGEID # 1387 (August 15, 2016 letter from Plaintiffs' counsel to Minnesota Life to "ensure that no further documentation is needed from our office" and to "advise us of the scheduled submission date for the appeal regarding the denial of McVay's accidental death claim").

Minnesota Life referred the file to a new physician consultant, Gretchen Bosacker, M.D. On August 15, 2016, following Dr. Bosacker's review (including a review of the Chamberlain Letter[6]), Minnesota Life sent a letter to Plaintiffs' counsel in which Minnesota Life affirmed its denial of the AD&D benefits. That letter states, in part:

> We have reviewed this claim on behalf of Paul W. McVay, your recent letter and the Emergency Room records you submitted from the Kettering Health Network's Sycamore Hospital dated November 8, 2010. Our Medical and Law departments have also reviewed this claim. Based on the terms of the policy, we must affirm our denial of the Accidental Death benefits. …
>
> In review of this claim and the medical records submitted, including the November 8, 2010 Emergency Room records, Mr. McVay had a history of leukemia. He was a resident of Hillspring care facility in late 2010 following a prolonged hospitalization for bacteremia. He was noted to have a significant decline in functioning, weakness, poor sitting balance, poor endurance and poor sitting

---
[6] *See* Doc. 54-1 at PAGEID # 1071-72.

tolerance. He required assistance with dressing, grooming and bathing, mobility in bed, transfers, ambulation, toileting and eating. He experienced some progress with physical and occupational therapies and by the end of October 2010 he was able to walk with a walker and the assistance of a therapist, four to eight steps.

Between September 27, 2010 and November 8, 2010, there was a significant, progressive decline in his white blood cell, red blood cell and platelet counts. His platelet count in the ER on November 8, 2010 was 10,000. On November 13, 2010, the physician at the care center was called to evaluate Mr. McVay following a fall. A hematoma was noted on his left anterior scalp. Later that day he was noted to have a decline in responsiveness. The physician documented that he spoke with the [sic] Mr. McVay's Power of Attorney and they agreed to treat him on site with hospice care as he had a DNR order.

Based on these medical records, Mr. McVay had been acutely and chronically ill in 2010 and was severely debilitated with poor endurance and severe weakness. Between his hospitalization in September 2010 and his death in November 2010, all of his blood cell lines decreased markedly and he had severe thrombocytopenia at the time of his death. Acute Lymphocytic Leukemia (ALL) is well documented in medical literature to cause thrombocytopenia and many patients with ALL experience bleeding. Any person with a platelet count of 10,000 or less is at very high risk for bleeding due to minimal trauma and spontaneous bleeding. Mr. McVay was evaluated on November 5th and November 8th for intracranial bleeding and radiologic studies were negative. …

Even if Mr. McVay sustained a subdural hematoma from a fall on November 13, 2010, it is likely that that fall, similar to his multiple previous falls, was caused by his extreme weakness, poor balance and debility. In this case, benefits would still not be payable under the terms of the policy.

Even though Mr. McVay's death was ruled an accident on the death certificate, this policy specifically excludes any payment of benefits when the death *results from or is caused directly or indirectly by any of the following: ... (3) bodily or mental infirmity, illness or disease*. His latest fall on November 13, 2010 was not independent of all other causes as defined in the policy and as indicated above. Therefore, no accidental death benefits are payable. …

(Doc. 54-4 at PAGEID # 1383 (emphasis in original).) Minnesota Life provided Freel or Plaintiffs' counsel with a Notice of rights upon affirming the denial of AD&D benefits. This lawsuit followed. Minnesota Life sent the August 2016 Denial Letter without specifically having advised Plaintiffs or their counsel of a "submission date for the appeal," apart from what was stated

10

in the notice following its initial denial on April 15, 2011.

## II. APPLICABLE LEGAL STANDARDS

On March 27, 2019, following briefing by the parties, Magistrate Judge Sharon L. Ovington entered a Decision and Order in this case that determined Minnesota Life's "denial of benefits is subject to the arbitrary and capricious standard of review because Minnesota Life has discretionary authority and the terms of the Policy contain a clear grant of such authority." (Doc. 37 at PAGEID # 758.) As further set forth in that Decision and Order:

> While the standard is deferential, it 'is not, however, without some teeth.' *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (2003). The arbitrary and capricious standard 'does not require us merely to rubber stamp the administrator's decision. Under the arbitrary-and-capricious standard, both the district court and this court must exercise review powers.' *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004) (citing *McDonald*, 347 F.3d at 172).

(*Id.*)

"The arbitrary and capricious standard is the least demanding form of judicial review of administrative action." *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 308 (6th Cir. 2010) (internal quotation marks omitted). "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Id.* The "standard requires courts to review the plan provisions and the record evidence and determine if the administrator's decision was 'rational.'" *Id.* "Although the evidence may be sufficient to support a finding of disability, if there is a reasonable explanation for the administrator's decision denying benefits in light of the plan's provisions, then the decision is neither arbitrary nor capricious." *Id.* "Yet the deferential standard of review does not mean courts should rubber stamp a plan administrator's decision—a court must review the quantity and quality of the medical evidence on each side." *Id.* (internal quotation marks omitted). "A decision reviewed according

11

to the arbitrary and capricious standard must be upheld if it results from a deliberate principled reasoning process and is supported by substantial evidence." *Id.* (internal quotation marks omitted).

On January 5, 2018, following briefing by the parties concerning a motion for discovery, Magistrate Judge Ovington entered an Order that provides other applicable legal principles:

> When, as in the present case, the plan administrator is an insurance company that both processes benefit claims and pays or declines to pay benefits, a conflict of interest exists for ERISA purposes. [citing *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 114 (2008); *Johnson v. Connecticut Gen. Life Ins. Co.*, 324 F. App'x 459, 465 (6th Cir. 2009)] … Courts must consider a plan administrator's possible conflict of interest as a factor in determining whether it acted arbitrarily or capriciously in denying a claim for benefits. [citing *Glenn*, 554 U.S. at 114-15; *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 292 (6th Cir. 2005) ('we must take into consideration the fact that Liberty is acting under a potential conflict of interest….'). Additional factors might arise. *Glenn*, 554 U.S. at 116 ('conflicts are but one factor among many that a reviewing judge must take into account.'). … '[p]lan administrators may not arbitrarily disregard reliable medical evidence proffered by a claimant, including the opinions of a treating physician.' *Evans v. UnumProvident Corp.*, 434 F.3d 866, 877 (6th Cir. 2006) (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003); *see Niswonger v. PNC Bank Corp. & Affiliates Long Term Disability Plan*, 612 F. App'x 317, 321 (6th Cir. 2015).

(Doc. 22 at PAGEID # 641-42, 644.[7])

### III. ANALYSIS

Minnesota Life argues that it properly denied the AD&D claim for two reasons: (1) McVay's death was not "accidental" under the terms of the Policy; and (2) McVay's death was caused by "bodily or mental infirmity, illness or disease," which triggers an exception to payment under the Policy. In support, it asserts that, at the time of his death, McVay was experiencing an overall decline in health and bodily function alongside his ongoing struggle with leukemia; after

---

[7] *Duncan v. Minn. Life Ins. Co.*, No. 3:17-cv-00025, 2018 WL 306609, 2018 U.S. Dist. LEXIS 2356, at *4-5, 7 (S.D. Ohio Jan. 5, 2018).

multiple falls and hospitalizations precipitated by his declining condition, McVay passed away after a final fall on November 13, 2010. Minnesota Life argues that, because the record as a whole confirms that Minnesota Life acted reasonably in denying AD&D benefits under the Policy, the Court should uphold its administrative decision.

Plaintiffs argue that Minnesota Life's process in reaching its decision to deny the AD&D claim was procedurally deficient and that Minnesota Life's denial of the claim is indefensible under any standard of review. Plaintiffs ask this Court to reverse Minnesota Life's administrative decision and direct an award of benefits to Plaintiffs or, in the alternative, remand the claim for further review by Minnesota Life.

### (1) **Application of the "Arbitrary and Capricious" Standard**

As set forth in Magistrate Judge Ovington's January 5, 2018 Order (quoted above), this Court considers Minnesota Life's conflict of interest as a factor in determining whether it acted arbitrarily or capriciously in denying the claim for AD&D benefits. *See also Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108, 128 S. Ct. 2343, 171 L. Ed. 2d 299 (2008) (holding that a conflict of interest is created where plan administrator both determines whether an employee is eligible for benefits and pays benefits out of its own pocket; that a "reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits; and that the significance of the factor will depend upon the circumstances of the particular case").

Straightforward language in an ERISA policy must be given its natural meaning. *Criss v. Hartford Accident & Indem. Co.*, No. 91-2092, 1992 U.S. App. LEXIS 13288, at *13 (6th Cir. May 28, 1992). The Sixth Circuit has also explained that:

> When a policy insuring against accidental death contains exclusionary language substantially to the effect that benefits are precluded where death directly or indirectly results from or is contributed to by disease, the inquiry is properly limited to determining if the accident alone was sufficient to cause death directly and independently of disease; an exclusionary clause therefore precludes recovery where death results from a pre-existing disease or from a combination of accident and pre-existing disease.

*Ann Arbor Trust. Co. v. Canada Life Assurance Co.*, 810 F.2d 591, 593 (6th Cir. 1987). Use of the term "accident" or "accidental" in a coroner's report or in medical records is certainly not automatically dispositive in determining whether a claim for AD&D benefits should be granted; it is the language of the policy or plan that governs. *See id.*; *Murdock v. Metro. Life Ins.*, No. 1:06CV02731, 2007 WL 6097205, 2007 U.S. Dist. LEXIS 98261, at *21-22 (N.D. Ohio Dec. 31, 2007). The use of such terms in a report or record may not correspond with their definition—or with other requirements or restrictions—in a policy or plan. *Murdock*, 2007 U.S. Dist. LEXIS 98261, at *22 ("[t]he definition of accidental death employed by the Plan is significantly more stringent than the one applied by the Coroner"); *Sangster v. Metropolitan Life Ins. Co.*, 54 F. Supp. 2d 708, 712 (E.D. Mich. 1999).

The Court has reviewed the Policy's provisions and the record evidence. The Court upholds the decision by Minnesota Life to deny AD&D benefits, finding it to be "rational." *Schwalm*, 626 F.3d at 308. Even considering the conflict of interest as a factor as well as the alleged procedural defects (addressed more below), the Court finds that Minnesota Life did not act arbitrarily or capriciously in denying the claim for AD&D benefits. Based on the evidence, "there is a reasonable explanation for [Minnesota Life's] decision denying benefits in light of the [Policy's] provisions" with respect to Plaintiffs' claim for AD&D benefits.[8] *Schwalm*, 626 F.3d

---

[8] The Court disagrees with Plaintiffs' argument that Minnesota Life employed an improperly restrictive application of the terms of the Policy. Caselaw and the plain meaning of the Policy's terms as they would be construed by an

14

at 308.

As set forth above, the Policy states that Minnesota Life will not pay the AD&D benefit where the "death … is caused directly or indirectly by … [b]odily or mental infirmity, illness or disease." (Doc. 54-1 at PAGEID # 1096.) Medical records demonstrate that, leading up to his death, McVay was suffering from leukemia and its effects. (*See, e.g.,* Doc. 54-2 at PAGEID # 1238, 1276, 1282.) The Supplemental Medical Certification for McVay's death certificate states that leukemia was a significant condition contributing to McVay's death, and the Postmortem Examination report states that McVay's death was contributed to by leukemia. (Doc. 54-3 at PAGEID # 1305, 1312.) The Court finds that Minnesota Life has met its burden of proving the policy exclusion applies to deny benefits and agrees with the decision that, based on the evidence,[9] McVay's death at least was caused indirectly by "[b]odily or mental infirmity, illness or disease." *Ann Arbor Trust*, 810 F.2d at 593; *Criss*, 1992 U.S. App. LEXIS 13288, at *15 (although policyholder's death followed injuries sustained in an automobile collision, "one of the factors causing the loss was the heart disease, which the policy excluded from coverage"); *Anderson-Tully Co. v. Pan Am. Life Ins. Co.*, No. 96-5348, 1997 U.S. App. LEXIS 16200 (6th Cir. June 26, 1997) (denial of benefits was not arbitrary or capricious where policyholder was admitted to the hospital with a heart condition, underwent an angioplasty, and was found dead on the floor in a pool of blood the next morning after apparently having dislodged an arterial sheath while falling, and the court found that, "[a]t best, [policyholder] died indirectly as a result of surgical treatment for

---

ordinary person supports Minnesota Life's application. The Court also disagrees with Plaintiffs' unfounded assertion that Minnesota Life "simply seized the opportunity to exclude coverage based on the mere mention of a pre-existing illness." (Doc. 59 at PAGEID # 1851.)

[9] As set forth above, evidence besides the Supplemental Medical Certification and Postmortem Examination report support the same outcome. That is true regardless of whether one looks only at the administrative record at the time of Minnesota Life's initial denial of the claim for AD&D benefits or at the administrative record at the time of affirming that denial (or also at the additional records submitted by Plaintiffs in this lawsuit).

disease of the body, bringing the case squarely within the terms of the policy's exclusionary clause" for losses that result directly or indirectly, wholly or partly, from disease or disorder of the body or mind); *Kallaus v. Nationwide Death Benefit Plan*, No. 2:09-cv-0899, 2012 WL 5411082, 2012 U.S. Dist. LEXIS 159012, at *29-35 (S.D. Ohio Nov. 6, 2012) (where plaintiffs argued that policyholder died from accident due to a medication error, court found decision to deny benefits was not arbitrary or capricious in view of exclusion for loss resulting in whole or in part from, or contributed to by, sickness, disease, or bodily infirmity—whether it resulted directly or indirectly from any of those three—where decedent suffered from fatty liver and kidney disease and evidence demonstrated they contributed to his death); *see also Wade*, 29 F. Supp. 3d 891.

Plaintiffs, in support of their argument that Minnesota Life acted arbitrarily or capriciously in denying the claim, point to some assumptions and hypotheticals that Minnesota Life posed in its August 15, 2016 denial letter. (Doc. 59 at PAGEID # 1849-50 (citing Doc. 54-4 at PAGEID # 1384).) However, as shown in the Factual Background section above, Minnesota Life relied on much more evidence in support of its decision than those assumptions and hypotheticals. Their presence does not change the Court's opinion that, based on the evidence, "there is a reasonable explanation for [Minnesota Life's] decision denying benefits in light of the [Policy's] provisions." *Schwalm*, 626 F.3d at 308.

Plaintiffs also support their argument by pointing to the Chamberlain Letter. However, that does not change the Court's opinion either. The Supreme Court has held that plan administrators are not required to accord special deference to the opinions of treating physicians or to credit the opinions of treating physicians over other evidence relevant to the policyholder's medical condition. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825, 123 S. Ct. 1965,

16

155 L. Ed. 2d 1034 (2003). However, a plan administrator is not permitted to "arbitrarily refuse to credit" the opinions of a treating physician. *Id.* at 834.

As set forth above, and otherwise shown in the administrative record, Minnesota Life referred the file to two separate physician consultants over the course of its initial review and the appeal. The Chamberlain Letter is dated (and was provided to Minnesota Life) after Minnesota Life's initial decision to deny the AD&D benefits claim; therefore, Minnesota Life could not have reviewed it or taken it into consideration for its initial decision. The record shows that Minnesota Life <u>did</u> review it and take it into consideration for purposes of the appeal and its decision to affirm its denial of benefits. It is apparent that Minnesota Life credited other relevant evidence over Dr. Chamberlain's opinion in making its decision—which it is permitted to do. *Id.* at 825. When Minnesota Life informed Plaintiffs of its decision on the AD&D claim and appeal, it provided reasons for its denial based on the evidence and Policy language. The Court finds that Minnesota Life did not "arbitrarily refuse to credit" the opinions of Dr. Chamberlain. *Id*. at 834; *see also Alstork v. AIG Life Ins. Co.*, No. 3:07-cv-303, 2008 WL 2788062, 2008 U.S. Dist. LEXIS 116414, at *19-23 (S.D. Ohio July 14, 2008) (rejecting plaintiff's argument that insurance company's decision to deny claim was arbitrary and capricious where insurance company reviewed and considered report from treating physician, but disagreed with the conclusions of the treating physician and instead preferred the opinions of reviewing doctors that were reasonable and based on the evidence).

The Court need not, and does not, address Minnesota Life's alternative argument to support its denial of the AD&D benefits (<u>i.e.</u>, that McVay's death was not covered as an "accidental death" under the Policy because it did not result "directly and independently of all other causes, from an

17

accidental injury which is unintended, unexpected, and unforeseen").

### (2) <u>Alleged Procedural Defects in Minnesota Life's Handling of the Claim</u>

A good portion of Plaintiffs' argument concerns Minnesota Life's alleged procedural defects in handling the claim. They allege that Minnesota Life's "procedurally deficient review process deprived Plaintiffs of a full and fair review of their claim." (Doc. 59 at PAGEID # 1843 (citing 29 U.S.C. § 1133).) Plaintiffs' allegations include that (a) Minnesota Life failed to respond to their requests regarding submission of documents following their June 3, 2016 production of medical records of McVay's November 8, 2010 visit to Sycamore Hospital; (b) Minnesota Life produced inconsistent versions of the administrative record; (c) Minnesota Life unreasonably delayed the adjudication of Plaintiffs' appeal; and (d) Minnesota Life failed to provide a complete copy of the correct ERISA plan in response to Plaintiffs' request for all ERISA plan documents applicable to the Policy.

As Plaintiffs' cited caselaw recognizes, "plan administrators need only substantially comply with ERISA notice requirements." *Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 460 (6th Cir. 2003). Additionally, when alleging deprivation of a full and fair review of their claim, plaintiffs must allege how a procedural violation prejudiced the presentation of their case. *Wintermute v. Guardian*, 524 F. Supp. 2d 954, 962 (S.D. Ohio 2007); *Carlson v. Reliance Standard Life Ins. Co.*, No. 3:15-CV-0200, 2017 U.S. Dist. LEXIS 174528, at *14 (M.D. Tenn. Oct. 19, 2017) ("when alleging that a full and fair review of a claim was not provided, a plaintiff must allege how such a violation has prejudiced the presentation of her case," and "[u]ltimately, a plaintiff must be in a 'worse position' because of a defendant's procedural violations than it would have been if defendant had complied with the regulations") (citing *Bartling v. Fruehauf Corp.*, 29

18

F.3d 1062, 1067-68 (6th Cir. 1994)).

Plaintiffs repeatedly allege, in conclusory fashion, that they were prejudiced by alleged procedural violations.[10] (*See* Doc. 59 at PAGEID # 1843-47.) However, they fail to allege how the presentation of their case was prejudiced by the alleged violations and to show that they are in a worse position because of those alleged violations than if Minnesota Life had complied with the regulations that it allegedly violated. *Wintermute*, 524 F. Supp. 2d at 962; *Carlson*, 2017 U.S. Dist. LEXIS 174528, at *14; *Bartling*, 29 F.3d at 1067. Additionally, based on the record, the Court disagrees with Plaintiffs' bald assertions that they were "prevented" from submitting favorable evidence. In fact, Minnesota Life invited Plaintiffs to submit whatever evidence they wished. (*See, e.g.,* Doc. 54-2 at PAGEID # 1206.) And, in Plaintiffs' counsel's June 3, 2006 request to be notified of a submission date for the appeal, the stated reason that he wanted to know such a date was "so that [he] can submit any further materials that [he] may care to file." (Doc. 54-4 at PAGEID # 1366 (emphasis added).) Plaintiffs do not explain what "favorable evidence" or "further materials" they would have submitted or the harm they allegedly sustained.

---

[10] For example, in their motion, Plaintiffs say:
- Minnesota Life's "administrative review process significantly hampered Plaintiffs' ability to pursue their claims adequately";
- Minnesota Life's alleged "violation of ERISA procedures not only harmed Plaintiffs at the administrative level, but also prevented the submission of favorable evidence in the administrative record, thus prejudicing Plaintiffs during this Court's review";
- Minnesota Life's alleged "lack of responsiveness" to Plaintiffs' counsel's request to be notified of a submission date for the appeal "prevented Plaintiffs from submitting additional favorable evidence before [Minnesota Life's] decision";
- Minnesota Life's alleged "consistent failure to permit Plaintiffs an opportunity to submit information related to their claim violated ERISA and the Federal Regulations and prejudiced Plaintiffs in their attempt to contest [Minnesota Life's] denial";
- Minnesota Life allegedly "decided Plaintiffs' appeal based on new evidence, without giving Plaintiffs any opportunity to respond to this evidence or properly supplement the administrative record"; and
- Minnesota Life's alleged "failure to provide Plaintiffs with the correct ERISA plan documents impeded their ability to pursue their claim effectively."

(Doc. 59 at PAGEID # 1843-47.)

The Court finds that Minnesota Life substantially complied with ERISA requirements and that Plaintiffs have not shown that the allegedly flawed procedure put Plaintiffs in a worse position than they would have been without such alleged defects. Therefore, they are not entitled to relief due to the alleged procedural violations.[11] *Bartling*, 29 F.3d at 1067; *Wintermute*, 524 F. Supp. 2d at 962; *Carlson*, 2017 U.S. Dist. LEXIS 174528, at *14.

## IV. CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendant's Motion to Uphold the Administrative Decision (Doc. 57), and the Court **DENIES** Plaintiffs' Motion to Vacate ERISA Benefit Denial and Procedural Challenges to the Administrative Decision or Alternatively for Remand (Doc. 59). Plaintiffs' First Amended Complaint (Doc. 11) is **DISMISSED WITH PREJUDICE**. This case shall be **TERMINATED** on the Court's docket.

**DONE** and **ORDERED** in Dayton, Ohio, this Tuesday, January 28, 2020.

s/Thomas M. Rose

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE

---

[11] Plaintiffs assert that the alleged procedural violations should affect the standard by which the Court reviews Minnesota Life's decision in denying Plaintiffs' AD&D claim and what deference, if any, to give that decision. Even if the Court agreed with Plaintiffs' assertion and found that there were procedural violations that placed Plaintiffs in a worse position than without such violations, this is not a case where the standard for reviewing Minnesota Life's decision would make a difference in this Court's outcome. Even reviewing Plaintiffs' AD&D claim *de novo*, giving Minnesota Life's denial of Plaintiffs' AD&D claim no weight, and considering the record and the evidence submitted by Plaintiffs, the Court still would find that Plaintiffs are not entitled to AD&D benefits under the Policy because the exclusion applies.